**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Clifford OLSON, Defendant–Appellant.**

**No. 85–2755.**

United States Court of Appeals, Seventh Circuit.

Argued April 7, 1987.

Decided May 9, 1988.

---

Robert G. Le Bell, Milwaukee, Wis., for defendant-appellant.

Joseph P. Stadtmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before COFFEY, RIPPLE and MANION, Circuit Judges.

COFFEY, Circuit Judge.

Defendant–Appellant, Clifford Olson, appeals his conviction of first degree murder. We affirm.

## I. Background

On Easter Sunday, April 10, 1977, the body of Clifford George Albers was found in the Wolf River on the Menominee Indian Reservation in Menominee County, Wisconsin. Three years later an indictment was returned charging the defendant with first degree murder.[1] On July 7, 1980, prior to the commencement of the trial, the government dismissed the original indictment without prejudice pursuant to Fed.R.Crim. P. 48(a). Olson was reindicted for the same offense in February 1985 and went to trial in September of that year.

At trial, the government's case in chief consisted primarily of the testimony of three main witnesses, Wanda Dick, Brenda LaRock, and Ella Peters. Wanda Dick testified that on April 9, 1977, she lived with Clifford Olson on the Menominee Indian Reservation in an area known as "South Branch." On that date, Dick testified, she was with Olson, Ella Peters, Brenda La-Rock, and Robert Kakwitch, riding in the defendant's car and drinking beer. At some point, the four left the reservation and turned onto a gravel road where they came upon a station wagon. Olson and Kakwitch got out of their car and spoke to the man driving the station wagon; that man was later identified by Brenda LaRock

as the victim, Clifford Albers. According to Dick, Olson grabbed Albers' arm and escorted him to Olson's car. Albers got into the back seat. Dick then drove Albers' station wagon to another location at Olson's request. When she returned to Olson's car, Albers was blindfolded. Olson, Dick, Peters, LaRock, Kakwitch and Albers then rode back to the South Branch area of the Menominee Reservation, parked the car and walked into the woods. Dick testified that they built a fire and drank beer and brandy, the defendant pouring brandy into Albers' mouth. Later, Olson hit Albers in the leg or ankle with an ax. Shortly thereafter, Dick saw Olson shoot Albers in the face with a handgun. Olson handed her the gun and she shot Albers once. Dick did not recall who else shot the victim. The defendant asked her to get a blanket from the car. Dick did so, and they rolled Albers' body into the blanket and placed it in the trunk of the car. Dick testified that they then drove to the Keshena Bridge and threw the body into the river.

Brenda LaRock's trial testimony substantially corroborated that of Wanda Dick. Her testimony differed only slightly from Dick's. LaRock stated that another individual, Charlie Peters, was also present during the events of April 9, that she was some distance away from the others in the woods when she heard gunshots, that when she walked back to the others she saw guns in the hands of Ella Peters, Bobby Kakwitch and Clifford Olson, and that after Wanda Dick shot the victim, Olson handed LaRock the gun, and she also shot him. Finally, LaRock identified a photograph of Clifford George Albers as that of the victim.

Ella Peters' trial testimony was also consistent with that of both Wanda Dick and Brenda LaRock. Peters' testimony differed from Dick's and LaRock's in that she did not, as LaRock had, mention the involvement of Charlie Peters, and that she stated that when the group left the reser-

---

1. Federal jurisdiction was premised on the fact that the murder occurred on the Menominee Indian Reservation. *See* 18 U.S.C. § 1153.

vation, the defendant talked of burglarizing a house in the area of Lakewood. Peters also testified that all of the individuals involved shot at the victim, but she only saw one gun.

In addition to the testimony of the three main witnesses, the government introduced various physical evidence, including a number of .22 caliber and .32 caliber bullets, and a 9mm or .38 autocaliber bullet, all taken from the body, a number of cartridge cases found at the scene of the crime in 1980, and a .22 caliber High Standard semiautomatic pistol that was seized in 1979 from the home of the defendant's mother pursuant to a search warrant.[2] Special Agent Richard A. Crum of the Federal Bureau of Investigation (FBI) Laboratory in Washington, D.C. was qualified and testified as a firearms identification expert. In Agent Crum's opinion, several of the .22 caliber bullets found in the victim's body were fired from the pistol seized from the home of the defendant's mother, and three others could have been fired from that pistol. Agent Crum also testified that cartridge cases found at the scene of the crime in 1980 had been fired from the same pistol.

On September 13, 1985, the jury found the defendant guilty of first degree murder, and Olson appealed. On May 7, 1986, we granted his "Motion to Remand" to the district court for consideration of a claim of ineffective assistance of trial counsel. The trial court held an evidentiary hearing on June 23, 1986 and found that Olson had not received ineffective assistance. Defendant then filed a motion in this court requesting that we expand the remand to include consideration of a motion for a new trial based on newly discovered evidence; we granted that motion. On October 14, 1986, the trial court denied Olson's motion for a new trial.

Olson now appeals from his conviction and from the denial of his motion for a new trial. He alleges a variety of errors, namely: 1) he received ineffective assistance of trial counsel; 2) the trial court abused its discretion by refusing to order a new trial on the basis of newly discovered evidence; 3) the 1980 indictment should have been dismissed with prejudice; 4) the indictment was insufficient; 5) certain physical evidence was improperly admitted; and 6) the trial court erred by refusing to require the government to produce a statement regarding the purpose of a payment made to a witness' boyfriend. We find no merit in any of these contentions.

## II. Ineffective assistance of counsel
### a) Standard

Olson's most serious contention, and the one pressed most strenuously at oral argument by his current counsel, is his claim of constitutionally ineffective assistance of trial counsel. After a hearing on this issue, Judge Curran, who had presided over the defendant's trial, found that the defendant had not been denied effective assistance. Judge Curran, applying the two-part standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), found both that the performance of defendant's trial counsel was reasonable and that the alleged errors did not prejudice the defense. Although both of these findings are "mixed questions of law and fact," *id.* at 698, 104 S.Ct. at 2070, and therefore subject to our independent review, *Sullivan v. Fairman*, 819 F.2d 1382, 1393 (7th Cir.1987), our own application of the *Strickland* standard to the facts of this case convinces us that the trial judge's conclusions are correct and that the defendant was not denied effective assistance of counsel.

The Supreme Court in *Strickland* set forth the strict standard to be applied to claims of ineffective assistance of counsel. A convicted defendant claiming constitutionally ineffective assistance must establish both deficient "performance" and "prejudice" to the defense. In assessing

---

**2.** Lucille Warrington, the defendant's mother, testified that the pistol that was seized from her home had been "hocked" to her by Hudson "Husky" Moore in the summer of 1978. In rebuttal, the government called Violet Tucker, Hudson Moore's mother-in-law, who testified that Moore died in 1979 and that she never saw him with a gun. Moore's widow, Gaynell Moore, also testified that she had never seen him with a handgun.

the "performance" component, "the proper standard ... is that of reasonably effective assistance." *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. at 2064. Moreover, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689, 104 S.Ct. at 2065 (citation omitted). Turning to the "prejudice" component, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693, 104 S.Ct. at 2067. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. For each of the nine alleged errors made by the defendant's trial counsel in this case, the defendant has failed to establish the existence of either deficient performance or prejudice. We will address each of the alleged errors briefly in turn.

#### b) Inadequate pre-trial contact

■ First, Olson claims that his attorney, William Coffey,[3] did not have adequate contact with him prior to trial. At the June 23 hearing before the district court, the defendant testified that Mr. Coffey spoke to him only twice before trial. He also testified, however, that he contacted Mr. Coffey at least once by telephone and that they corresponded by mail. In contrast, Mr. Coffey testified that he met with the defendant three or four times prior to trial, conferred with the defendant by telephone when the defendant called him at his office, and conferred with the defendant's brother, wife, and sister. At any rate, as we have noted previously,

"[w]e know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel." *United States ex rel. Kleba v. McGinnis,* 796 F.2d 947, 954 (7th Cir.1986). Nor have any cases establishing such a minimum been presented to us by Olson's appellate counsel. Moreover, in *Kleba* we pointed out that an experienced attorney "can get more out of one interview with a client than a neophyte lawyer." *Id.* The trial judge in this case referred to Attorney Coffey's "years of experience." A lawyer as experienced as Mr. Coffey in criminal law can get more out of one conference with his client than a less well-trained lawyer could get out of several. As in *Kleba,* we hold that the defendant "failed to overcome th[e] presumption that his counsel rendered effective assistance." *Id.*

Furthermore, Olson has failed to "affirmatively prove prejudice" resulting from his counsel's failure to have more frequent contact with him prior to trial. Olson suggests only that the alleged paucity of contact resulted in his failure to present an alibi defense. From our examination of the record we conclude that the failure to present an alibi defense did not itself constitute deficient performance, nor did it result in prejudice.

#### c) Failure to present alibi defense

■ Olson's second contention is that his counsel's failure to investigate and call alibi witnesses and to properly advise him regarding the alibi defense constitutes ineffective assistance. At the June 23 evidentiary hearing, Mr. Coffey testified that the defendant initially called the possibility of an alibi defense to his attention at the outset of the trial, and that he then advised the defendant that if he knew of any witnesses that could provide an alibi, the defendant should have them contact him. Attorney Coffey testified further, that contrary to Olson's testimony at the hearing, Olson had not provided Coffey with the names and addresses of four alibi witness-

---

3. The late attorney William Coffey was not re- lated to the author of this opinion.

es. Instead, Mr. Coffey stated, he was given the name of one Robert Chevalier and another individual. Not until the trial had commenced, did Chevalier and Olson's sister contact Attorney Coffey and indicate that they were available to provide an alibi. After his interview with the prospective witnesses, Mr. Coffey advised Olson that it would be a mistake to call them as alibi witnesses due to their inability to adequately answer his questions. The attorney, based upon his experience and ethical judgment, refused to present what he believed to be a questionable or possibly improper alibi defense. According to Mr. Coffey, following a discussion of the matter, the defendant agreed that he did not want to pursue an alibi defense. This is precisely the kind of strategic choice, made by a competent, experienced and well-trained lawyer that a court should not second-guess, and this court will not. Olson argues that his counsel's choice was not based on sufficient information because Mr. Coffey had failed to investigate all four of the individuals Olson proposed as alibi witnesses. We note, however, that "[s]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations of investigation," and "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Marshall v. Young,* 833 F.2d 709, 714–15 (7th Cir.1987) (quoting *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066). Moreover, " 'trial counsel [need not] track down every lead or ... personally investigate every evidentiary possibility before choosing a defense and developing it.' " *Id.* at 715 (quoting *Sullivan,* 819 F.2d at 1392). Given Mr. Coffey's testimony regarding the results of his conversations with the two individuals who contacted him, the defendant's failure to raise the alibi issue until immediately before trial, and the conflicting testimony regarding the number of names Olson provided, we are convinced that Attorney Coffey's decision not to pursue an alibi defense, after satisfying himself that two of the proposed witnesses would not be credi-

ble, certainly did not fall below the level of "reasonably effective assistance" required by *Strickland.*

Moreover, the defendant has failed to establish any prejudice stemming from that decision. The witnesses that the defendant argues should have been called as alibi witnesses testified at the evidentiary hearing. After reviewing their testimony, we agree with the experienced trial judge's conclusion that it was incredible, inconsistent, and unlikely to persuade the jury. The defendant and his appellate counsel have failed to establish that had counsel presented an alibi defense, there is a "reasonable probability that ... the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

d) Failure to impeach witnesses

█ Olson's next four contentions all involve counsel's handling of the government's three main witnesses, Wanda Dick, Brenda LaRock, and Ella Peters. He contends that trial counsel's failure to investigate and call as witnesses individuals who could testify to Dick, LaRock, and Peters' bad reputation for truth and veracity constitutes ineffective assistance of counsel. At the June 23 hearing, however, Attorney Coffey testified that he was never presented with the names of any impeachment witnesses. Thus, keeping in mind that "counsel's strategic choices may quite properly be determined or substantially influenced by the defendant's own statements or actions," *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2067, *quoted in Marshall,* 833 F.2d at 715, we find that the defendant has failed to establish that his counsel's performance was unreasonable in this regard. Even if it were, in order to establish prejudice resulting from a failure to investigate, the defendant must make " 'a comprehensive showing of what the investigation would have produced.' " *Sullivan,* 819 F.2d at 1392 (quoting *United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1016 (7th Cir.1987)). The defendant and his appellate counsel fail, even now, to specify what witnesses an investigation would

have uncovered or what their testimony would have added to his defense. Moreover, he admits that "trial counsel [did make] inroads during cross-examination in discrediting the three ... main witnesses." Our own examination of the trial transcript bears this out. We therefore hold that the defendant has failed to establish prejudice resulting from his counsel's alleged error.

■ Olson also contends that his trial attorney's failure to investigate and interview Dick, LaRock, and Peters themselves constitutes ineffective assistance. At the June 23 hearing, Mr. Coffey testified that he did arrange to interview Brenda LaRock but she failed to keep the appointment. More importantly, the attorney testified that in his considered opinion, based upon more than twenty years of trial experience, it was unnecessary to interview the three witnesses prior to trial because the evidence contained in the government's files was a sufficient basis for cross-examination. We note that Attorney Coffey vigorously cross-examined the three women at trial. We refuse to find that his decision not to interview or investigate them, based on his professional judgment and thorough knowledge of the case, was deficient performance. The defendant has clearly not established any prejudice stemming from the allegedly deficient performance; indeed, aside from his unsupported, conclusory statements, he has alleged none.

■ Next, Olson contends that his counsel should have investigated and called a witness who could have established Wanda Dick's motive to lie. In 1980, Calvin Cornelius had provided an affidavit to the defendant's previous attorney. The affidavit stated that, while Cornelius, Olson, and Wanda Dick were all incarcerated in the Brown County jail in 1977 or 1978, Wanda Dick said to Olson, "You go back to your wife and I will make it miserable for you and—you around so you get lots of time." At the June 23 evidentiary hearing, Mr. Coffey testified that he did not call Cornelius to testify at trial because Cornelius had a felony record, and his affidavit referred to the fact that defendant Olson and Wanda Dick had been in custody on state charges of kidnapping. In Attorney Coffey's professional judgment, revealing the fact of Olson's incarceration on those charges by calling Cornelius to testify would not have been in Olson's best interests. Moreover, Mr. Coffey did call another witness, Judith Long, who testified that Wanda Dick had told her that if Olson went back to his wife, she would ruin his life. Ms. Long did not have a felony record, and her testimony regarding her conversation with Dick did not involve revealing the fact of the defendant's prior incarceration on kidnapping charges. We can only conclude that Mr. Coffey's handling of this matter was a proper exercise of good trial judgment. In addition, since the Cornelius testimony would have been cumulative if presented and, in our opinion, damaging to the defendant's case, we conclude that the decision to refrain from calling him as a witness was proper and in no way prejudiced the defense.

■ Olson also objects to his counsel's failure to use a prior statement made by Wanda Dick to Rose Gauthier in order to impeach Dick at trial. Apparently, in 1980, Rose Gauthier stated to government investigators that Dick had told her a year earlier that she knew about the murder and that Olson had done it. Defendant argues that because Gauthier indicated that Dick had also told her that Clifford Olson's brothers were present at the time of the murder, the statement differed materially from her trial testimony and should have been used to impeach her. At the hearing, however, Mr. Coffey pointed out that Dick's statement to Rose Gauthier was made more than a year before her earliest statement to the authorities, and, in describing the murder, it substantially corroborated her trial testimony with respect to the defendant's involvement. We therefore conclude that Attorney Coffey's decision not to introduce Gauthier's statement was eminently reasonable and resulted in no prejudice to the defense.

e) Failure to investigate additional witnesses

■ Next, Olson challenges his attorney's failure to properly investigate, inter-

view, and call as witnesses two individuals, Robert Beyersdorff, a/k/a Charlie Peters, and Robert Kakwitch, who were alleged by some of the government's witnesses to have been present at the time of the murder. He fails, however, to allege specifically what evidence such investigation and interviews would have uncovered; and, aside from a conclusory allegation that the defense was impeded in attempting to impeach the government's three main witnesses, he fails to recite any facts that might even remotely result in prejudice.

### f) Failure to object to testimony regarding intent to commit burglary

■ Olson also challenges his trial counsel's failure to object to the testimony of Brenda LaRock and Ella Peters indicating that the defendant intended to commit burglary on the night of the murder. At the evidentiary hearing, Mr. Coffey testified that he used the fact that while LaRock and Peters testified to such an intent, other witnesses did not, to establish inconsistencies among the three main witnesses' testimony as well as between the witnesses' trial testimony and their prior grand jury testimony. This is a matter of trial tactics on the part of experienced trial counsel which this court will not second-guess, particularly in light of the improbability that counsel's decision affected the verdict, given the overwhelming evidence of Olson's guilt.

### g) Failure to appeal introduction of photographs

■ Finally, Olson challenges "[t]he failure of trial counsel *to appeal* the prejudicial introduction of photographs of the deceased." Appellant's Brief of December 3, 1986 at 7 (emphasis added). Attorney Coffey properly objected at trial to the publication to the jury of the photographs. His decision not to appeal the issue is irrelevant to the question of his effectiveness at trial.

In sum, we conclude that the defendant has failed to establish that any of the alleged errors amounted to deficient performance or that any of the alleged errors

prejudiced the defense. While we have separately addressed each of the defendant's nine contentions in order to demonstrate their lack of merit, we emphasize that, under the demanding standard of *Strickland*, this kind of after-the-fact second-guessing clearly fails to establish ineffective assistance of trial counsel. The district court properly concluded that Olson was not denied effective assistance of counsel.

Many of these claims of ineffective assistance of counsel which come to our attention, like the claims raised here, are without merit and accomplish little other than the waste of judicial resources, and possibly reflect unfairly on trial counsel. While the Supreme Court has noted that it is a "natural tendency to fault an unsuccessful defense," it has stated forcefully that the tendency is one that courts must "counteract." *Nix v. Whiteside,* 475 U.S. 157, 165, 106 S.Ct. 988, 994, 89 L.Ed.2d 123 (1986). Otherwise,

> "[c]riminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one on counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client."

*Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Thus the Court, in *Strickland,* set a stringent standard to be applied to claims of ineffective assistance of trial counsel and it should be adhered to.

### III. *Newly discovered evidence*

■ The district court's denial of Olson's motion, pursuant to Fed.R.Crim.P. 33, for a new trial based on newly discovered evidence was also proper. The heart of the newly discovered evidence consists of the affidavit of Brenda LaRock, one of the

government's three main witnesses, whose trial testimony we referred to above.[4]

Olson describes the affidavit as a total recantation of LaRock's trial testimony. According to the affidavit, dated August 18, 1986, a statement given by Ms. LaRock to a private investigator on June 20, 1986 is true and correct. In that statement, LaRock indicated that she was intimidated, by threats against herself and her children, into testifying as she did, and that she had "no memory" at the time of the statement "of any of what they say happened." The affidavit continues:

"7. That your affiant never observed Clifford Olson shoot any individual at any time.

8. That at the time of the trial when your affiant testified regarding Clifford Olson's participation in the alleged murder, she was not telling the truth.

9. That she was not present when Mr. Albers was shot and was not present in the woods described by the other witnesses at the purported incident surrounding the death of Mr. Albers."

According to the government, this new evidence is not a "recantation," but merely a statement that in 1986 LaRock could not recall the events at the time of the murder. Given the language of the affidavit quoted above, we find this argument somewhat puzzling if not disingenuous. While it is true, as the government stated at oral argument, that nothing in the affidavit provides an alibi for the defendant or otherwise exonerates him, LaRock does recant her testimony that she witnessed Olson shooting the victim.

The appropriate standard for evaluating the new trial motion is, therefore, that of *Larrison v. United States*, 24 F.2d 82 (7th Cir.1928). In general, "[i]n order to obtain a new trial on the basis of newly discovered evidence the defendant must establish that the evidence in question (1) came to the defendant's knowledge only after trial; (2) could not have been discovered sooner

through the exercise of due diligence; (3) is material, and not merely impeaching or cumulative; and (4) would probably lead to an acquittal in the event of a new trial." *United States v. Goodwin*, 770 F.2d 631, 639 (7th Cir.1985), *cert. denied* 474 U.S. 1084, 106 S.Ct. 858, 88 L.Ed.2d 897 (1986); *see also United States v. Nero*, 733 F.2d 1197, 1202 (7th Cir.1984). However, the standard applied in cases of recantation is "more lenient." *Goodwin*, 770 F.2d at 639.

"In the ... specific situation where the newly discovered evidence allegedly demonstrates that there was false testimony at trial, or that a government witness has recanted, this court has articulated slightly different requirements. In *Larrison* ... our court held that in such a situation three requirements must be satisfied before a new trial will be granted:

'(a) The court is reasonably well satisfied that the testimony given by a material witness is false.

(b) That the jury *might* have reached a different conclusion.

(c) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.'

[Larrison, 24 F.2d] at 87–88."

*Nero*, 733 F.2d at 1202.

In *Nero*, we went on to state this court's standard of review of a district court's disposition of a motion for a new trial:

"It is within the sound discretion of the district court to decide whether a new trial should be granted on the basis of newly discovered evidence. Thus, on review our inquiry is whether the discretion granted to the district court has been abused. *U.S. v. Davis*, 604 F.2d 474, 483 (7th Cir.1979). The heavy burden placed upon the appellant ... was noted by the court in *Davis*:

'The party who claims that the trial court erred in denying his motion for a new trial is not likely to be successful.

---

4. The defendant also presented the affidavit of a private investigator who took Ms. LaRock's statement on June 20, 1986, and the affidavit of the law clerk of the defendant's current counsel, stating that LaRock's sister had told her that she had witnessed anonymous threats made to LaRock.

The appellate court properly defers to the view of the trial court, and will affirm unless there has been an error as a matter of law or a clear and manifest abuse of judicial discretion.'
*Id.* at 484, (quoting 2 C. Wright, Federal Practice and Procedure, § 559 at 541–42 (1969))."

*Nero,* 733 F.2d at 1202.

Because the LaRock affidavit fails to satisfy the first and third requirements stated in *Larrison,*[5] we find no such error or abuse in this case.

First, this court is not "reasonably well satisfied that the testimony given by [LaRock at trial] is false." While, as we stated above, LaRock's August 18, 1986 affidavit is properly characterized as a recantation, in her June 20, 1986 statement to the defendant's private investigator, she stated only that she could not remember the events on the night of the 1977 murder. This, along with the fact that, as the government pointed out at oral argument, LaRock has "flip-flopped" (testifying in her first appearance before the grand jury in 1981 that she had never seen Clifford Olson shoot anyone, before the second grand jury and at trial in 1985 that she witnessed the defendant shoot Clifford Albers, and, finally recanting her trial testimony), leaves us unconvinced that her trial testimony was false. Moreover, given the presence of substantial other evidence corroborating LaRock's trial testimony—namely the testimony of Wanda Dick and Ella Peters and the physical evidence previously described—we are not "reasonably well satisfied" that LaRock's testimony was false.

Nor do we believe, given these same facts, that the third *Larrison* requirement, that the defendant was surprised by LaRock's trial testimony, was met. LaRock's trial testimony was consistent not only with her own testimony before the second grand jury, but also with the testimony of Dick and Peters. The defendant could hardly have been surprised at trial. Thus, the LaRock affidavit failed to meet the requirements for a new trial and we hold that the district court properly denied the defendant's motion.

## IV. Dismissal of 1980 indictment

Defendant next challenges the dismissal of the 1980 indictment against him and his subsequent reindictment on the same charges.[6] On July 7, 1980, prior to the commencement of trial, the government dismissed the first indictment without prejudice pursuant to Fed.R.Crim.P. 48(a).[7] In its "Order for Dismissal," the prosecution stated, as its only reason, "that the interests of justice require no further prosecution of this matter at this time."[8]

Rule 48(a) provides that the government may dismiss an indictment prior to trial "by leave of court." The leave of court requirement allows the courts "to exercise discretion over the propriety of a prosecutorial motion to dismiss.... [T]he primary purpose of the rule is protection of a defendant's rights ... 'to prevent harassment of a defendant by charging, dismissing and re-charging without placing a defendant in jeopardy.' " *United States v. Salinas,* 693 F.2d 348, 351 (5th Cir.1982) (quoting *United States v. Cox,* 342 F.2d 167, 171 (5th Cir.), *cert. denied* 381 U.S. 935, 85 S.Ct.

5. In addition, although we need not address the issue, we are doubtful that the second requirement, "[t]hat the jury *might* have reached a different conclusion," is met.

6. Olson contends, in the alternative, that his trial counsel's failure to raise this issue in the district court amounts to ineffective assistance of counsel. Because the defendant did not raise this issue on remand to the district court, we consider it waived.

7. Rule 48(a) of the Federal Rules of Criminal Procedure provides:
 "*By Attorney for Government.* The Attorney General or the United States Attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant."

8. According to a document included in the appendix to the defendant's appellate brief, the prosecution decided to dismiss the indictment because of its belief that Wanda Dick, the only eyewitness against the defendant known to the prosecution at that time, might perjure herself at trial.

1767, 14 L.Ed.2d 700 (1965)) (footnotes omitted); *see also United States v. Derr*, 726 F.2d 617, 619 (10th Cir.1984). "The key factor in a determination of prosecutorial harassment is the propriety . . . of the Government's efforts to terminate the prosecution—the good faith . . . of the Government in moving to dismiss." *Salinas*, 693 F.2d at 351 (footnote omitted).

Defendant admits that he did not object at the time of the government's request for leave to dismiss and did not raise the issue at any time prior to his conviction on the second indictment. Now, however, relying on the opinion of the Tenth Circuit in *United States v. Derr*, 726 F.2d 617, Olson argues that the court's dismissal of the first indictment without prejudice was improper. He contends that the government moved to dismiss the initial indictment against him only to gain a tactical advantage and therefore, that the trial court erred in granting leave to dismiss without prejudice.

In *Derr*, the government sought to dismiss the first indictment on the day on which trial was to begin. The defendant objected to the dismissal of the indictment, "asserting that she was ready for trial and that the government had not alleged any legitimate or compelling reason for dismissing the indictment without prejudice." *Id.* at 618. The trial court granted the government's request without further inquiry and without a statement of its reasons or the facts explaining its decision. After the grand jury returned another indictment charging Derr with the same criminal conduct, she moved to dismiss the second indictment on the ground that the court had erred in dismissing the original indictment

without prejudice. The trial court agreed, and dismissed the second indictment. The Court of Appeals for the Tenth Circuit affirmed the decision of the district court, holding that the dismissal of the first indictment on the day of trial, over the defendant's objections, without requiring the government to state its reasons for seeking dismissal, was an abuse of discretion.

■■■■ This case is clearly distinguishable from *Derr*. First, the defendant-appellant failed to object to the dismissal of the first indictment. Perhaps more importantly, after he was reindicted, Olson did not move for dismissal of the second indictment on the grounds that the first had been improperly dismissed. Thus, the issue now raised on appeal was never brought to the attention of the trial court.[9] Our standard of review is therefore the stringent plain error standard rather than the abuse of discretion standard employed by the Tenth Circuit in *Derr*. *See* Fed.R. Crim.P. 52(b). Moreover, in *Derr*, the defendant, in objecting to the dismissal, explicitly and strenuously asserted that she was prepared to proceed to trial. We believe it is reasonable to infer from Olson's failure to object that he was not similarly prepared and did not desire to go to trial at the time of the dismissal of the first indictment. Finally, in this case, unlike *Derr*, the dismissal apparently[10] did not occur literally "on the eve" of trial. Given the defendant's failure to object, the fact that the dismissal did not occur on the eve of trial, and the presumption, appropriate in such cases, that the prosecution acted in good faith in determining that dismissal was in the public interest, *see Salinas*, 693 F.2d at 351–52, we conclude that the dis-

**9.** Olson did raise the issue in the district court following our remand for consideration of his claim of ineffective assistance of counsel. The district judge refused to consider the issue, finding it outside the scope of the remand. We concur in that finding. Defendant contends, nevertheless, that the district court could have considered the issue "as a motion after verdict." We disagree. In general, the filing of a notice of appeal divests the district court of jurisdiction. Moreover, the "Supplemental Statement of Issues," in which the defendant first raised the issue of the propriety of the dismissal of the first indictment, was filed in the district court

over nine months after the guilty verdict; it therefore cannot be construed as a timely motion for arrest of judgment. *See* Fed.R.Crim.P. 34.

**10.** It is unclear precisely how far in advance of the trial date the first indictment was in fact dismissed. At oral argument, defendant's counsel stated that to the best of his recollection, it was "just before trial." The government's attorney stated that it was "a week or ten days" prior to the scheduled trial date.

missal of the first indictment without prejudice and subsequent reindictment was not plain error requiring reversal of the defendant's conviction.[11]

### V. Sufficiency of 1985 indictment

 Olson's last three challenges to his conviction were raised in his original appellate brief prior to this court's remand to the district court for consideration of his motions for a new trial. First, the defendant challenges the sufficiency of the 1985 indictment; he argues that it failed to allege an essential element of the crime. The indictment alleged, in pertinent part:

"On or about April 9, 1977, at or near South Branch, in the State and Eastern District of Wisconsin and within Indian Country,

### CLIFFORD OLSON,

an Indian,

committed murder in the first degree, that is; willfully, deliberately, maliciously and with premeditation, shot and killed Clifford George Albers;

All in violation of Title 18, United States Code, Sections 1153 and 1111."

Olson's challenge to the indictment is based on the fact that it fails to explicitly allege that the killing was done "with malice aforethought."

The standard for testing the sufficiency of an indictment is well-settled. "The test for determining the sufficiency of the indictment is whether the indictment sets forth the elements of the offense charged and sufficiently apprises the defendant of the charges to enable him to prepare for trial."[12] *United States v. Garcia–Geronimo,* 663 F.2d 738, 743 (7th Cir.1981); *see also Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed. 2d 240 (1962); *United States v. Johnson,* 805 F.2d 753, 757–58 (7th Cir.1986). Olson, wisely we believe, does not argue that he was unable to prepare a defense. He challenges only the technical sufficiency of the indictment in failing to include the element of "malice aforethought."

As we stated in *Garcia–Geronimo,* "[i]n determining whether an essential element of the crime has been omitted from the indictment, courts will not insist that any particular word or phrase be used." 663 F.2d at 742 (citing *United States v. Weatherspoon,* 581 F.2d 595, 600 (7th Cir.1978)). We find that the allegation in the indictment that Olson "willfully, deliberately, maliciously and with premeditation, shot and killed Clifford George Albers," sufficiently alleges the element of malice aforethought. "Malice aforethought" is defined as a "predetermination to commit an act without legal justification or excuse.... A malicious design to injure.... The intentional doing of an unlawful act which was determined upon before it was executed.... An intent, at the time of a killing, willfully to take the life of a human being." *Black's Law Dictionary* 863 (5th ed. 1979) (citations omitted). It is true, as the defendant points out, that 18 U.S.C. § 1111 defines murder as "the unlawful killing of a human being with malice aforethought" and that the additional element of "willful, deliberate, malicious and premeditated killing" distinguishes first from second degree murder under federal law.[13]

---

11. We express no opinion as to whether the district court's dismissal of the first indictment, without requiring a statement of the prosecution's reasons for seeking to dismiss and the facts underlying that decision, in the absence of an objection by the defendant, might constitute an abuse of discretion.

12. The indictment must also "enable the accused to plead a judgment under the indictment as a bar to any subsequent prosecution for the same offense." *United States v. Wabaunsee,* 528 F.2d 1, 2 (7th Cir.1975) (citing *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962)). The sufficiency of the present indictment for this purpose is not challenged.

13. Section 1111 of Title 18 of the United States Code provides, in pertinent part:

"(a) Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death

Nonetheless, given the definition quoted above, it is also true that if the government proves that a killing was willful, deliberate, malicious and premeditated, it has necessarily proved that the killing was committed with malice aforethought. The defendant was sufficiently apprised of the essential elements of the crime charged.[14] We therefore refuse to search for error and hold that the failure to include the words "malice aforethought" rendered the indictment fatally defective.[15]

## VI. Adequacy of chain of custody

Defendant next alleges that the trial court erroneously admitted certain physical evidence despite the government's failure to adequately establish a chain of custody for the items. "A trial court's decision to admit real evidence will not be reversed unless it has abused its discretion." *United States v. Wheeler*, 800 F.2d 100, 106 (7th Cir.1986). We find no abuse of discretion in this case.

Briefly, the defendant argues that certain bullets and bullet fragments recovered from the victim's body during the autopsy were improperly admitted because the evidence at trial indicated that, after these items were brought to the Wisconsin State Crime Laboratory and sealed in containers, FBI Agent Gregory Hunter unsealed each container and wrapped the items in cotton for shipping to the FBI Laboratory in Washington, D.C. Defendant complains that, while the evidence at trial (in the form of the FBI Agent's "Report of Activity") indicated what the agent "did in terms of unsealing the package, [and] what he did in terms of wrapping [the items] . . . the report surely doesn't say anything about how they were replaced in the cartons or when they were replaced in the cartons or anything else."

 The government concedes that because of the death of Agent Hunter prior to Olson's trial, there are unavoidable gaps in the chain of custody of the bullets and bullet fragments. An uninterrupted chain of custody, however, is not a prerequisite to admissibility. Gaps in the chain go to the weight of the evidence, not its admissibility. *Wheeler*, 800 F.2d at 106. "If the trial judge is satisfied that in reasonable probability the evidence has not been altered in any material respect, he may permit its introduction." *United States v. Aviles*, 623 F.2d 1192, 1198 (7th Cir.1980).

In this case, the defendant presented no affirmative evidence of altering or tampering with the evidence. Additionally, the nature of the evidence—bullets and bullet fragments—makes alteration of the evidence unlikely. *See United States v. Brown*, 482 F.2d 1226, 1228 (8th Cir.1973) (considering nature of the articles (packages of heroin) as factor in determining admissibility). Finally, where the items have been in official custody and there is no affirmative evidence of tampering, a "presumption of regularity attends official acts of public officers and the courts presume that their official duties have been discharged properly." *Aviles*, 623 F.2d at 1198; *see also United States v. Jefferson*, 714 F.2d 689, 696 (7th Cir.1983). Given these factors, we find no abuse of discretion in the admission into evidence of the bullets and bullet fragments recovered from the victim's body during the autopsy.

 Olson also objects to the admission of a lead fragment that allegedly fell out of

---

of any human being other than him who is killed, is murder in the first degree.
Any other murder is murder in the second degree."

**14.** We note also that our construction of the indictment is bolstered by the fact that the trial court properly instructed the jury regarding the essential elements, including malice aforethought, of first degree murder. *See Wabaunsee*, 528 F.2d at 4 ("Where the indictment contains language which can be construed [to supply a missing element] . . . then subsequent efforts at trial to correct the defect are useful to bolster an appellate court's construction of the indictment.")

**15.** Because we conclude that the indictment sufficiently alleged malice aforethought without reference to the language of the statute, we do not address the defendant's argument that a mere citation to the statute cannot correct the failure to allege an essential element of the offense. *See Wabaunsee*, 523 F.2d at 4 (addressing the issue and holding citation to statute insufficient to supply missing element).

the victim's arm when his body was taken from the Wolf River. There was testimony at trial that Alex Askanet, a Tribal Police Officer, picked up the piece of lead. There was also testimony that FBI Special Agent Robert Kleinschmidt gave FBI Special Agent Richard Prokop a piece of lead, allegedly the fragment retrieved by Officer Askanet, on the same day. The chain of custody of the lead fragment from that point on is not challenged; the defendant's argument is that there was no evidence connecting the lead fragment retrieved by Tribal Police Officer Askanet with that given by Kleinschmidt to Prokop. Neither Askanet nor Kleinschmidt testified at trial; Agent Kleinschmidt had retired and Officer Askanet was deceased. As the government points out, however, Agent Prokop did testify that he sent Agent Kleinschmidt to the scene with instructions to contact the tribal authorities. Moreover, Agent Prokop testified that he recognized Agent Kleinschmidt's initials as well as "Alex A," an abbreviation for "Alex Askanet," on the container that held the lead fragment. As stated above, "[t]he trial court's discretionary ruling on identification of evidence sufficient for its admissibility is subject to reversal only for an abuse of discretion," *United States v. Bridges*, 499 F.2d 179, 185 (7th Cir.), *cert. denied* 419 U.S. 1010, 95 S.Ct. 330, 42 L.Ed.2d 284 (1974), and gaps in the chain of custody go to the weight of the evidence rather than its admissibility. We find no abuse of discretion in the trial court's determination that the testimony at trial established a chain of custody sufficient for admissibility; whatever deficiencies may have existed were properly a matter to be resolved by the jury in weighing the evidence.

## VII. Failure to provide statement regarding payment of $400.00

Olson's final contention[16] on appeal is that the trial court's refusal to require the government to provide a statement regarding the purpose of a payment of $400.00 to the boyfriend of prosecution witness Wanda Dick constitutes reversible error. In 1980 Wanda Dick testified before a grand jury that she and Clifford Olson were responsible for the murder of Clifford Albers; in 1981 she testified that she, Clifford Olson, Ella Peters, Brenda LaRock, and Robert Kakwitch were involved in the murder. Prior to trial in 1985, the government disclosed to defendant's counsel that, in February or March of 1985, the FBI had paid Russell Biddle, Dick's boyfriend, an informant's fee of $400.00. At trial, outside the presence of the jury, Dick testified that she was not aware of any payment made to Biddle. The defense then requested that the government be required to provide a statement regarding the purpose of the payment. The court refused the request but did require that the U.S. Attorney disclose Russell Biddle's address to defendant's counsel. Following several unsuccessful attempts by the defense to contact Biddle, the court required the government to provide information regarding his place of employment. Attempts to contact Biddle there were similarly unavailing. The defense then renewed its motion for a statement by the government regarding the purpose of the payment to Biddle. The court denied the request. On appeal defendant contends that this denial constitutes reversible error.

Defendant cites no authority for the proposition that the prosecution can be

16. In a *pro se* "Supplemental Brief" Olson, who is a Native American, also attempts to raise a challenge to the racial composition of the jury. He alleges that the jury included no Native Americans and no Blacks. Under *Teague v. Lane*, 820 F.2d 832, 837 (7th Cir.1987), *cert. granted*, ──── U.S. ────, 108 S.Ct. 1106, 99 L.Ed.2d 268 (1988), however, it is clear that the "fair cross-section" requirement of the Sixth Amendment applies only to the jury pool, not to the petit jury, absent a pattern of systematic exclusion of a particular class. Olson alleges no such pattern. Moreover, to the extent that his contention that there "were no Native Americans

[on which] to use a peremptory challenge" can be liberally construed as a challenge to the composition of the jury pool rather than the petit jury itself, the exhibits attached to his supplemental brief are inadequate to raise any question as to the constitutional adequacy of the composition of the jury pool. Finally, although the defendant also complains that there were no Native Americans on the grand jury that indicted him, he presents no evidence of the existence of racial discrimination in the selection of grand jurors. *Compare Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

compelled to assist the defendant's case by producing a potentially useful statement of the sort requested here.[17] In its brief the government treats the contention as a due process claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In *Brady* the Supreme Court held that the prosecution's failure to disclose evidence favorable to the defense denied the defendant due process. 373 U.S. at 87, 83 S.Ct. at 1196. More recently, in *Bagley,* the Court held that the holding in *Brady* applies to impeachment as well as exculpatory evidence. However, in *Bagley,* the Court also stated, "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." 105 S.Ct. at 3381. The Court further clarified the materiality standard: "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 3384. This standard is not met here. The court's refusal to compel disclosure of the purpose of the payment, therefore, did not deny the defendant due process and does not require reversal of his conviction.

Wanda Dick had testified previously in the trial court, out of the presence of the jury, that she knew nothing of the payment to her boyfriend. While it is possible, as Olson argues on appeal, that Biddle somehow influenced her to testify against the defendant, this is mere speculation; no proof of Biddle's alleged influence was ever offered. Moreover, given the fact that she had testified against Olson before the grand jury as early as 1980, five years before the payment to Biddle was made, it is unlikely that she testified as she did as a result of Biddle's influence. Further, Dick's credibility was impeached at trial by her prior convictions and by her admitted

perjury before the grand jury and her lies to FBI agents. The incremental impeachment value of a statement by the government regarding the purpose of the payment to Biddle is therefore doubtful. Most importantly though, given the corroboration of Dick's testimony by that of Brenda LaRock and Ella Peters, it would be impossible for us to conceive, much less hold, that there is a "reasonable probability" that the disclosure of the requested information would have resulted in Olson's acquittal. The evidence of guilt was overwhelming. Our confidence in the outcome of the defendant's trial remains unshaken. The evidence requested was not material under the standard enunciated in *Bagley,* and the court's refusal to compel its disclosure does not require reversal.

*VIII. Conclusion*

Upon review of Olson's numerous allegations of reversible error, we hold each and every one to be without merit and accordingly affirm the defendant's conviction.

---

**17.** We note that Fed.R.Crim.P. 16(a), governing disclosure of evidence by the government, provides no support for the defendant's conten-

tions. That rule authorizes disclosure of certain categories of evidence, not including the sort of evidence requested here.