**UNITED STATES, Appellee,**

v.

**Stuart A. MAXWELL, Senior Airman U.S. Air Force, Appellant.**

No. 68,354.
CMR No. 29194.

U.S. Court of Military Appeals.

Argued July 14, 1993.

Decided Sept. 28, 1993.

Certiorari Denied Feb. 22, 1994.

See 114 S.Ct. 1056.

For Appellant: *Captain Gilbert J. Andia, Jr.* (argued); *Colonel Terry J. Woodhouse* (on brief); *Lieutenant Colonel Jay L. Cohen* and *Major Mary C. Yastishock.*

For Appellee: *Captain Jules D. Silberberg* (argued); *Colonel Richard L. Purdon, Lieutenant Colonel Jeffery T. Infelise, Captain David C. Wesley* (on brief).

*Opinion of the Court*

COX, Judge:

On May 21, 1989, at approximately 6:00 p.m., appellant's car hit another car head-on on a 2-lane road in Germany. The driver of the other car died. There were no passengers and no witnesses. Appellant was flown by helicopter to the Army Regional Medical Center where he was temporarily identified as "John Doe" and treated for his injuries. Appellant subsequently was convicted of involuntary manslaughter by driving while intoxicated.[1]

At trial, the military judge denied appellant's motion to suppress the results of a blood-alcohol test (BAT) administered while appellant was being treated in the emergency room. This was the only evidence of appellant's intoxication at the time of the accident. Appellant challenges admissibility of the test results on two grounds. First, he asserts the blood-alcohol test was not medically necessary, and, therefore, its results were not admissible pursuant to Mil.R.Evid. 312(f), Manual for Courts-Martial, United States, 1984. Next, he argues the Government failed to establish a sufficient chain of custody for the blood sample. We disagree.

Mil.R.Evid. 312, which provides for admissibility of evidence that would otherwise be excluded as the product of an unlawful search or seizure, states:

> (f) Nothing in this rule shall be deemed to interfere with the lawful authority of the armed forces to take whatever action may be necessary to preserve the health of a servicemember. Evidence or contraband obtained from an examination or intrusion conducted for a valid medical purpose may be seized and is not evidence obtained from an unlawful search or seizure within the meaning of Mil. R.Evid. 311.

Appellant's blood was drawn in the emergency room for a trauma pack—a series of samples, including five or six test tubes of blood, taken in anticipation of tests which may be run depending on the orders of the physician. Pursuant to the doctor's orders, appellant's blood was tested for alcohol and revealed an alcohol content of 1.80 or 1.81 milligrams per milliliter. Dr. (Captain) Barnes, one of the physicians present in the emergency room while appellant was being treated, testified that blood-alcohol tests are performed where a physician suspects alcohol may be involved and that alcohol is involved in about 40 percent of car accidents. He also noted that protocol suggests blood-alcohol tests be performed in trauma cases and stated the results of the blood-alcohol tests are used in diagnosis. To a doctor it is important to know whether a patient has consumed alcohol because it can cause a drop in blood pressure and can change fluid levels and mental status. Dr. (Captain) Kane, the treating physician, testified that it is standard operating procedure to perform a list of tests on trauma patients; a blood-alcohol test is on that list to help determine factors impacting the patient's condition. He additionally testified, however, that in appellant's case the results of the blood-alcohol test did not actually affect his treatment.

Appellant argues that the blood-alcohol test was thus not necessary for his treatment and should not have been admitted into evidence. The military judge made the following conclusions:

> Dr. Kane ordered blood tests in accordance with the standard operating procedure of the Trauma Protocol, since the accused was a trauma patient at the time showing signs of head trauma. Both Dr Barnes and Dr Kane gave examples of why a medical BAT [blood alcohol test] is sought and why it's a suggested practice to get it, and how it's used in determin-

---

1. Appellant was tried by general court-martial composed of officer members; and, contrary to his pleas, he was convicted of involuntary manslaughter, in violation of Article 119, Uniform Code of Military Justice, 10 USC § 919. He was sentenced to a bad-conduct discharge, confine-ment for 24 months, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence as adjudged, and the Court of Military Review affirmed with a lengthy unpublished opinion.

ing diagnosis and treatments. Diagnosis and treatment are both valid medical purposes within [Mil.R.Evid.] 312(f)....

The military judge's conclusions are supported by the record. Although the samples did not ultimately impact appellant's treatment, they were taken for valid diagnostic and treatment purposes and are admissible pursuant to Mil.R.Evid. 312(f). *See* Drafter's Analysis of Mil.R.Evid. 312(f), Manual, *supra* at A22–19; *see also United States v. Miller,* 15 USCMA 320, 35 CMR 292 (1965) (a blood sample which was taken from an unconscious accused "for diagnostic purposes" was admissible).

▪ Turning to appellant's second argument regarding admissibility of the blood-alcohol test, we note the Government bears the burden of establishing an adequate foundation for admission of evidence against an accused. *United States v. Gonzales,* 37 MJ 456 (CMA 1993); *United States v. Courts,* 9 MJ 285, 290 (CMA 1980); *United States v. Nault,* 4 MJ 318, 319 (CMA 1978). If the items sought to be introduced are readily identifiable, a foundation may be established by an identifying witness. *United States v. Parker,* 10 MJ 415, 416 (CMA 1981)[*citing United States v. Fowler,* 9 MJ 149 (CMA 1980) ]. However, for admission of fungible evidence,[2] there must be a "showing of continuous custody which preserves the evidence in an unaltered state." *United States v. Nault,* 4 MJ at 319. Likewise, the results of tests performed on a fungible substance require a "chain of custody on which to predicate admission of the laboratory analysis into evidence." *United States v. Courts,* 9 MJ at 290; *see United States v. Nault, supra; United States v. Bass,* 8 USCMA 299, 24 CMR 109 (1957). The Government must show that there is a reasonable probability the sample which was tested was in fact from the purported source *and* that it was not altered. This means the "chain-of-custody evidence must be adequate—not infallible." *United States v. Ladd,* 885 F.2d 954, 957 (1st Cir.1989). The Government is not required to exclude every possibility of tampering. *United States v. Courts,* 9 MJ at 291 [*citing Gass v. United States,* 416 F.2d 767, 770 (D.C.Cir.1969); *United States v. Jones,* 404 F.Supp. 529, 542–43 (E.D.Pa. 1975), *aff'd,* 538 F.2d 321 (3d Cir.1976) ]. Where the chain of custody is incomplete, other evidence may be sufficient to "bridge the gap." *See United States v. Nault,* 4 MJ at 320. "[T]he fact of a 'missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be.' " *United States v. Howard–Arias,* 679 F.2d 363, 366 (4th Cir.), *cert. denied,* 459 U.S. 874, 103 S.Ct. 165, 74 L.Ed.2d 136 (1982). There may be other facts sufficient to convince the military judge that the evidence in question is in a reliable condition. *United States v. Fowler,* 9 MJ at 152.

▪ "[T]he Court need only be satisfied that in *reasonable probability* the article had not been changed in important respects." *United States v. Courts,* 9 MJ at 291 (emphasis added) [*quoting West v. United States,* 359 F.2d 50, 55 (8th Cir.), *cert. denied,* 385 U.S. 867, 87 S.Ct. 131, 17 L.Ed.2d 94 (1966) ]. *See also United States v. Ladd,* 885 F.2d at 956 [It must be *"reasonably probable* that the evidence is what it purports to be" (emphasis added) ]; *United States v. Olson,* 846 F.2d 1103, 1116 (7th Cir.1988) [" 'If the trial judge is satisfied that in *reasonable probability* the evidence has not been altered in any material respect, he may permit its introduction.' " (Emphasis added.) ][3] The Govern-

---

**2.** Blood samples are considered fungible, thus requiring a chain of custody to be established for their admission as evidence. *See* E. Imwinkelried, P. Giannelli, F. Gilligan, F. Lederer, *Courtroom Criminal Evidence* § 503 at 97 (1987).

**3.** Prior to the adoption of the Federal Rules of Evidence, the [federal] courts described the standard of proof [for chain of custody] in various ways. The most common expression of the standard was that the offering party had to establish the identity and condition of the exhibit by a "reasonable probability." Phrases such as "reasonable certainty" and "reasonable assurance" seem only variants of this standard. The reasonable probability standard appears to require no more than the "preponderance of evidence" or "more probable than not" standard, and some courts have

ment may meet its burden of proof with direct or circumstantial evidence.

■ The forms from the emergency room indicate that appellant arrived at 8:00 p.m. on May 21, 1989, and Dr. Kane ordered appellant's blood-alcohol test. However, Dr. Kane had little recollection of the night appellant entered the emergency room and had no knowledge of who drew appellant's blood or delivered it to the laboratory; he did not remember labeling the test tubes or filling out a lab slip for the tests. He testified it is standard procedure to mark test tubes "John Doe" where the patient is unidentified. Sergeant Wolf (a Licensed Practical Nurse), the nurse assisting Dr. Barnes with appellant's treatment, also stated he could not remember who drew appellant's blood or took it to the lab. The nurse explained that the test tubes are a vacuum and are filled with blood by inserting a syringe into each tube. After blood has been put in the tube, nothing can be added without blowing the top off the tube.

Specialist Ritter was the lab technician the night appellant was treated in the emergency room. He testified it is standard procedure for him to match the name on the lab slip with the name on the tube, assign the sample a number, make an entry on the log sheet, and run the ordered test. On the night appellant was tested, Specialist Ritter ran a blood-alcohol test on blood in a tube labeled "John Doe" received from the emergency room which revealed a blood alcohol level of 1.8 milligrams per milliliter; later that evening he received word from the emergency room that "John Doe" was "Stewart Maxwell." He called the emergency room to relay the test results at 8:55 p.m.

The circumstantial evidence in this case supports the conclusion that the blood sample at issue was appellant's and that its condition was not substantially changed from the time it was taken to the time it was tested. Appellant arrived in the emergency room with serious injuries from a car accident, and a blood-alcohol test is standard trauma procedure. It is also standard procedure for someone to take samples from the emergency room immediately to the laboratory. Where the identity of a patient is unknown, the samples are labeled "John Doe." *The testimony of Sergeant Wolf, albeit not conclusive, supports the proposition that there was no other "John Doe" admitted to the emergency room on the night of appellant's accident; "John Doe" had blood drawn for tests; and there was only one "John Doe" entered into the log sheet in the laboratory.* This John Doe was later identified as "Stewart Maxwell." The vacuum test tube containing the sample was labeled "John Doe." If anyone had attempted to tamper with the sample, the vacuum would have been lost and the cap would have blown off the tube. The short time span between appellant's arrival at the hospital and the reporting of the results of the blood-alcohol test (55 minutes), as well as lack of motive, support the conclusion the sample was "substantially unchanged." *United States v. Parker,* 10 MJ at 416.

In *United States v. Bass,* 8 USCMA 299, 24 CMR 109 (1957), two urine specimens were taken and put in sealed containers. One handler of the specimens failed to testify at trial; he had etched his initials on the samples and held them for less than 24 hours. The gap in the chain in custody resulting from the lack of testimony did not prevent the evidence from being prop-

explicitly expressed the standard in those terms.... [T]he trial court determines whether this standard has been satisfied.
*Courtroom Criminal Evidence, supra,* § 506 at 103–04 (footnotes omitted).
    The [state] courts have expressed the proponent's burden in various ways. Some have said that he must prove the chain by a "clear preponderance" of the evidence. Others have said that he must establish a "reasonable cer-

tainty." Others say that he must prove the chain "unequivocally." Still others say he must create a "clear assurance." The most definite and often used expression is that the proponent must prove a "reasonable probability."
Imwinkelried, *The Identification of Original, Real Evidence,* 61 Mil.L.Rev. 145, 158 (Summer 1973) (footnotes omitted).

erly admitted. There was no evidence of tampering, and the successor handler testified that when he received the samples, the seals were in tact. The Government successfully bridged the gap in the chain. *See also United States v. Burton*, 866 F.2d 1057, 1059 (8th Cir.) (chain of custody adequate for purposes of admissibility where urine samples retained proper labels but were left unattended "in an unlocked box" for a day), *cert. denied*, 490 U.S. 1110, 109 S.Ct. 3167, 104 L.Ed.2d 1029 (1989); *United States v. Picard*, 464 F.2d 215, 216 n.1 (1st Cir.1972) (no error in admitting heroin where there was no testimony from a chemist who had handled it; but the heroin was in a sealed, locked envelope and the seal had not been broken); *West v. United States*, 359 F.2d at 55 (sealed packets and presumption of regularity of handling of evidence by public officials support finding that in reasonable probability evidence had not been tampered with).

■ "[G]aps in the chain of custody" do not necessarily prevent admission of evidence. *United States v. Olson*, 846 F.2d at 1117; *see United States v. Lott*, 854 F.2d 244, 250 (7th Cir.1988); *see also United States v. Strozier*, 31 MJ 283, 287 (CMA 1990); *United States v. Pollard*, 27 MJ 376 (CMA 1989); *United States v. Howard–Arias*, 679 F.2d at 366. Any deficiencies in that chain "go to the weight of the evidence rather than its admissibility." *United States v. Olson*, 846 F.2d at 1117; *see United States v. Lott*, 854 F.2d at 250; *see also United States v. Ladd*, 885 F.2d at 956; *United States v. Lampson*, 627 F.2d 62, 65 (7th Cir.1980). We emphasize that here we are only talking about the question of admissibility of evidence. A judge's decision to admit a piece of evidence does not carry with it any judicial imprimatur as to its weight. Our system of justice contemplates that the factfinder—here the court-martial panel—will decide questions of

fact. If evidence meets the admissibility threshold and is not barred by other legal rules, the evidence goes to the factfinder. There, all the frailties and doubts surrounding the piece of evidence are to be developed and argued by the party opposing admissibility. The factfinder then determines afresh whether the evidence is probative. In a case such as this, the panel decided for itself whether the blood sample came from appellant and whether it was unaltered at the time of its analysis. For us to decide for ourselves the ultimate degree of probativeness of the sample would be to usurp the "jury" function.

Considering all the evidence in this case, including the lack of motivation to alter the blood sample and lack of any physical evidence of tampering, we believe it is sufficient for purposes of admissibility to link the results of the blood sample to appellant. *See United States v. Courts*, 9 MJ at 292. The trial bench is entitled to "due deference," *United States v. Strozier*, 31 MJ at 288, and we hold the military judge did not abuse his discretion in allowing the results of the blood-alcohol tests to be admitted into evidence. *See United States v. Ladd*, 885 F.2d at 956; *United States v. Olson*, 846 F.2d at 1116, 1117; *United States v. Lott*, 854 F.2d at 250–51; *United States v. Gay*, 774 F.2d 368, 374–75 (10th Cir.1985); *United States v. Howard–Arias*, 679 F.2d at 366; *United States v. West*, 359 F.2d at 55; *United States v. Carrott*, 25 MJ 823, 824 (AFCMR 1988); *United States v. Hudson*, 20 MJ 607, 608 (AFCMR), *pet. denied*, 21 MJ 32 (CMA 1985).

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges CRAWFORD, GIERKE, and WISS concur.