# United States Navy–Marine Corps Court of Criminal Appeals

Before
GASTON, STEWART, and HOUTZ
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Timothy A. IRVIN**
Private First Class (E-2), U.S. Marine Corps
Appellant

**No. 201900174**

Decided: 17 December 2020

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge:
Emily A. Jackson-Hall

Sentence adjudged 1 February 2019 by a special court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, confinement for twelve months, and a bad-conduct discharge.

For Appellant:
*Lieutenant Michael W. Wester, JAGC, USN*

For Appellee:
*Major Clayton L. Wiggins, USMC*
*Lieutenant Kimberly Rios, JAGC, USN*
*Captain McKenzie B. Ehrhardt, USMC*

Senior Judge GASTON delivered the opinion of the Court, in which Judges STEWART and HOUTZ joined.

———————————————

**PUBLISHED OPINION OF THE COURT**

———————————————

GASTON, Senior Judge:

Appellant was convicted, contrary to his pleas, of unauthorized absence, willfully disobeying a superior commissioned officer, two specifications of failure to obey a lawful order, two specifications of wrongful use of cocaine, breaking restriction, and willfully discharging a firearm under such circumstances as to endanger human life, in violation of Articles 86, 90, 92, 112a, and 134, Uniform Code of Military Justice [UCMJ], 10 U.S.C. §§ 886, 890, 892, 912a, 934.

He asserts five assignments of error [AOE], which we renumber as follows: (1) the military judge abused her discretion by admitting evidence obtained from a search of Appellant's cellular phone in violation of the Fourth Amendment; (2) the military judge abused her discretion by admitting urinalysis evidence without proof of a continuous chain of custody that preserved the evidence in an unaltered state; and the evidence is factually insufficient to support Appellant's convictions of: (3) Specification 1 of Charge I (failure to obey lawful order), (4) Specification 4 of Charge II (willful discharge of a firearm under such circumstances as to endanger human life), and (5) Specification 2 of Charge VI (wrongful use of cocaine). We find merit in Appellant's second and fourth AOEs. We set aside his conviction of Specification 2 of Charge VI—mooting his fifth AOE, set aside his conviction of Specification 4 of Charge II, and affirm its lesser-included offense. We affirm the remaining findings and, upon reassessment, affirm the sentence.

## I. BACKGROUND

In the early morning hours of 31 August 2015, Appellant notified emergency medical services that he had found his wife unresponsive and cold to the touch in their on-base apartment in Okinawa, Japan. Mrs. Irvin was later pronounced dead at a U.S. Naval Hospital. The Naval Criminal Investigative Service [NCIS] conducted a death scene investigation and found no signs of struggle. Appellant denied striking his wife or that there were any marital problems or substance abuse issues. A toxicology report noted the presence of alcohol in Mrs. Irvin's system consistent with normal consumption and no other drugs. An autopsy left the cause and manner of her death undetermined.

Suspecting foul play, NCIS opened an investigation. Background interviews revealed Appellant was involved in a years-long, extramarital sexual relationship (2014-2016) at the time of his wife's death; that he sent his paramour a Facebook message telling her, "love you too," the night after his wife's death; that he laughed and joked with another prior girlfriend the following day and exchanged flirtatious messages with other females soon thereafter; that he attempted to choke a prior girlfriend during their 2011-2013 relationship; that he strangled a different girlfriend while she was pregnant in October 2016, resulting in her hospitalization; that he was physically violent toward a third girlfriend, Ms. "Foster,"[1] whom he dated from October 2016 to April 2017; and that he received $100,000 in life insurance proceeds from his wife's death. Forensic analysis of a phone found next to Mrs. Irvin's body revealed that in the weeks leading up to her death the phone had been used to visit a website containing the phrase, "my_husband_hit_me_for_the_first_time." The analysis also revealed that on the morning of her death it was used to search for "if somebody's body locks up and they ain't moving what does that mean not breathing," and moments later to search for symptoms of death.[2] During a follow-up interview on 11 April 2017, Appellant told NCIS that on the night Mrs. Irvin died, he became frustrated with her actions and placed his hands over her mouth until she went limp and passed out, and then the following morning found her unresponsive and was unable to revive her.

## II. DISCUSSION

### A. Search of Appellant's Cell Phone

After implicating himself in his wife's death, Appellant was placed in pretrial confinement, and his Apple Watch and iPhone were secured by his command, Marine Aviation Training Support Squadron One [MATSS-1], located onboard Naval Air Station [NAS] Meridian, Mississippi. On 5 June 2017, NCIS Special Agent [SA] Sierra requested a Command Authorization for Search and Seizure [CASS] for Appellant's Apple Watch and iPhone from the superior commander with authority over MATSS-1, the Commanding General of Marine Corps Training Command [TRNGCMD Commander]. The

---

[1] All names in this opinion, other than those of Appellant, the judges, and counsel, are pseudonyms.

[2] App. Ex. IX at 17.

agent requested authorization to search for "[i]mages and text, including email messages, and Internet history, contained within [them]" and "digital data files, whether stored on [the devices], or stored remotely and accessible by the [devices]" that were "evidence of Article 107 (False Statements), 118 (Murder) and 128 (Aggravated Assault/Assault Consummated by a Battery) of the [UCMJ]," along with "writings that tend to show dominion and control over the stored data files."[3] In his supporting affidavit, SA Sierra discussed the results of the NCIS investigation outlined above and stated that there was probable cause to believe the search would reveal evidence of Appellant and Mrs. Irvin's marital issues, the identity of additional witnesses, and other evidence to support that Appellant had engaged in the above listed crimes. The TRNGCMD Commander found probable cause based on the affidavit and granted the CASS.

Appellant's phone was thereafter subjected to a "logical extraction" of its digital contents. The ensuing search of those contents did not yield any evidence of the suspected offenses of false statements, murder, or assault. However, a video was found in the phone's text messages showing Appellant firing a handgun into the air from a car window while driving at night on a backroad near Hattiesburg, Mississippi, in October 2016. Appellant's then-girlfriend, Ms. Foster, had recorded the video from the passenger's seat and then sent it to him via text message at his request a few days later.

### 1. The military judge's suppression ruling

Prior to trial, Appellant moved to suppress the video obtained during the search of his phone. He argued that the TRNGCMD Commander lacked the authority to grant the CASS because the place where the phone was located on NAS Meridian was not subject to his authority; that the CASS was overbroad and not supported by probable cause; and that in executing the CASS, the investigators did not limit their search of the phone in any reasonable way.

After a hearing, the military judge denied the suppression motion in a written ruling. While she did not address whether the TRNGCMD Commander lacked authority to grant the CASS, the military judge concluded the phone was properly held by MATSS-1 after Appellant was placed in pretrial confinement. She further concluded that based on the information contained in the agent's affidavit, the TRNGCMD Commander had probable cause to

---

[3] App. Ex. IX at 20.

issue the CASS and the search was conducted lawfully in discovering the video, which was connected to both one of the alleged victims and the timeframe discussed in the affidavit.

### 2. *Standard of review and the Fourth Amendment*

Appellant asserts the military judge erred in failing to suppress the cell phone evidence and the derivative testimony of Ms. Foster. We review suppression rulings for an abuse of discretion, viewing the evidence in the light most favorable to the party that prevailed at trial. *United States v. Blackburn*, 80 M.J. 205, 211 (C.A.A.F. 2020) (citations omitted). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citation and internal quotation marks omitted).

Evidence obtained as a result of an unlawful search or seizure by a governmental agent is generally inadmissible against an accused if:

> (1) the accused makes a timely motion to suppress or an objection to the evidence . . . (2) the accused had a reasonable expectation of privacy in the person, place, or property searched; the accused had a legitimate interest in the property or evidence seized when challenging a seizure; or the accused would otherwise have grounds to object to the search or seizure under the Constitution of the United States as applied to members of the Armed Forces; and (3) exclusion of the evidence results in appreciable deterrence of future unlawful searches or seizures and the benefits of such deterrence outweigh the costs to the justice system.

Mil. R. Evid. 311(a). Once the defense makes an appropriate motion or objection, the prosecution bears the burden of proving the evidence was lawfully obtained. Mil. R. Evid. 311(d)(5)(A). In the military context, searches and seizures may be authorized by "[a] commander . . . who has control over the place where the property or person to be searched is situated or found." Mil. R. Evid. 315(d)(1).

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon *probable cause*, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV (emphasis added). Probable cause exists where the totality of the circumstances establish a "fair probability that evidence of a crime will be found at the identified location." *United States v. Nieto* 76 M.J. 101, 105 (C.A.A.F. 2017) (citations and internal quotation marks omitted). We give "great deference" to such probable cause determinations in light of the Fourth Amendment's strong preference for authorized searches, such that if the authorizing official has "a substantial basis to find probable cause, a military judge [does] not abuse his discretion in denying a motion to suppress." *Id.* (citations and internal quotation marks omitted).

With respect the Fourth Amendment's requirement of particularity, the Supreme Court has explained:

> By limiting the authorization to search to the specific areas and things for which there is probable cause to search, the requirement ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit.

*Maryland v. Garrison*, 480 U.S. 79, 84 (1987). Thus, search authorizations must "describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." *United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017) (quoting *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)).

Searches of electronic devices like cellular phones are not exempt from the Fourth Amendment's requirements. *Riley v. California*, 573 U.S. 373, 386 (2014). However, the Court of Appeals for the Armed Forces [CAAF] has recognized that such devices present "distinct issues," and "[t]he prohibition of general searches is not to be confused with a demand for precise ex ante knowledge of the location and content of evidence." *Richards*, 76 M.J. at 369-70 (citation omitted). Given "the dangers of too narrowly limiting where investigators can go," such searches may be properly limited "to evidence of specific federal crimes or specific types of material" without necessarily "requir[ing] particular search methods and protocols." *Id.* at 370 (citation omitted). Nevertheless, such searches remain subject to an "ex post reasonableness analysis" to assess whether they have struck the appropriate balance between being "expansive enough to allow investigators access to places where incriminating materials may be hidden, yet not so broad that they become the sort of free-for-all general searches the Fourth Amendment was designed to prevent." *Id.* (citations omitted).

### 3. Analysis

As an initial matter, Appellant argues the TRNGCMD Commander lacked authority to issue the CASS for his cellular phone. We disagree. Based

on the evidence before us, we find that concomitant with Appellant's apprehension and placement in pretrial confinement, his cell phone was kept in the possession of his command, MATSS-1, onboard NAS Meridian. While we agree that the TRNGCMD Commander did not have control over the entirety of NAS Meridian, we find he did have control over the personnel and property of his subordinate unit, MATSS-1, where the phone was located. Hence, we conclude the evidence is sufficient to establish that the CASS was properly issued by a commander "who ha[d] control over the place where the property . . . to be searched [wa]s situated." Mil. R. Evid. 315(d)(1).

We find no abuse of discretion with the remainder of the military judge's ruling. First, we find reasonable her conclusion that the TRNGCMD Commander had probable cause to issue the CASS based on the information contained in the agent's affidavit. While the CASS was broadly worded in terms of the "digital data files" that could be searched and seized, it was affirmatively limited to searching and seizing specific types of data (i.e., images and text, email messages, and internet history) for evidence of specific crimes. As the military judge found, the evidence presented to the TRNGCMD Commander was that Appellant had engaged in abusive extramarital relationships before, during, and after the death of Mrs. Irvin, and had engaged in both telephonic and text-based conversations during the course of those relationships. SA Sierra's affidavit also revealed evidence that Appellant had used at least one cell phone to conduct internet searches in connection with his wife's death (e.g., "if somebody's body locks up and they ain't moving what does that mean not breathing").[4] These circumstances established a fair probability that a search of Appellant's phone would yield evidence of not only his motive and role in the suspected murder of Mrs. Irvin, but also the assaults alleged by the other women. We find the affidavit provided sufficient probable cause to search Appellant's cellular phone for the specific items listed for seizure.

Second, as the military judge's ruling points out, the video at issue was found embedded in a message to Appellant from one of the alleged victims, Ms. Foster, in October 2018, during the timeframe discussed in the agent's affidavit. Specifically, it was sent by Ms. Foster in response to Appellant's request to "send my video of shooting my gun."[5] Given the facts and circumstances of this murder and assault investigation, we do not find the

---

[4] App. Ex. IX at 17.

[5] App. Ex. XCIII at 5.

lack of evidence regarding the particular search methods and protocols employed, which in any event are not required, fatal to our ex post reasonableness analysis. In light of the surrounding context, we conclude that the video evidence at issue was properly seized under the doctrine of plain view, as it was observed during the course of a lawful search executed in a reasonable fashion. Mil. R. Evid. 316(c)(5)(C). As the military judge properly found, the evidence on its face—a video of Appellant firing a handgun out of a car window while driving—reasonably supported the belief that it was evidence of a criminal offense.

Even assuming *arguendo* the TRNGCMD Commander lacked either control over the place where the phone was situated or probable cause to issue the CASS, we conclude the search and seizure of this evidence fall within the good faith exception to the exclusionary rule. Under this exception, evidence obtained as a result of an otherwise unlawful search or seizure may be used if:

> (A) the search or seizure resulted from an authorization to search, seize or apprehend issued by an individual competent to issue the authorization under Mil. R. Evid. 315(d) . . . ;

> (B) the individual issuing the authorization or warrant had a substantial basis for determining the existence of probable cause; and

> (C) the officials seeking and executing the authorization or warrant reasonably and with good faith relied on the issuance of the authorization or warrant. Good faith is to be determined using an objective standard.

Mil. R. Evid. 311(c)(3). All three of these conditions are satisfied here.

First, with respect to subsection (A), CAAF has held this condition is satisfied "if *the officers executing the warrant reasonably believe* that the magistrate has authority over the place searched." *United States v. Chapple*, 36 M.J. 410, 414 (C.M.A. 1993) (emphasis added). In *Chapple*, an overseas installation commander issued a CASS for an off-base apartment leased in Italy by a Sailor whose unit was not under the installation commander's command. The court found that because neither the off-base apartment nor the Sailor was under his control, the installation commander lacked authority to issue the CASS. However, because the installation commander was generally empowered to authorize searches, and because he, his staff

judge advocate, the investigating agents, and the military judge all erroneously believed the commander had authority to authorize the search in question, the court found that condition (A) was met and applied the good faith exception.[6]

In this case, the TRNGCMD Commander was a general officer with broad authority to authorize searches over the property and personnel under his control. SA Sierra's CASS application, executed before a deputy staff judge advocate, leaves us little doubt that the agent chose to pursue the CASS from the TRNGCMD Commander precisely because he believed the TRNGCMD Commander had authority over the personnel and property of MATSS-1, where the phone was located when the CASS was issued.[7] As we ourselves have concluded that the TRNGCMD Commander did indeed have this authority, we conclude the agent's belief in this regard was reasonable.

Similarly, with respect to subsection (B) of the exception dealing with the issue of probable cause, CAAF has held this condition is satisfied "if *the law enforcement official had an objectively reasonable belief* that the magistrate [or commander] had a 'substantial basis' for determining the existence of probable cause." *United States v. Perkins*, 78 M.J. 381, 387 (C.A.A.F. 2019) (quoting *United States v. Carter*, 54 M.J. 414, 422 (C.A.A.F. 2001) (emphasis added)).[8] Conversely, the condition is not satisfied "if the materials presented

---

[6] One Circuit Court commenting on Mil. R. Evid. 315(d)—the basis for subsection (A) of Mil. R. Evid. 311(c)(3)—in the context of good faith has found that the rule is "no bastion of clarity . . . . One could reasonably conclude that a military service member's commanding officer is the officer who has control over the place where he or she is 'situated.'" *United States v. Seerden*, 916 F.3d 360, 367 (4th Cir. 2019).

[7] Notwithstanding Appellant's argument to contrary, we believe the agent's affidavit provides sufficient basis to find that the phone was indeed located at MATSS-1, or in the possession of MATSS-1 personnel, at the time the CASS was issued, as opposed to some other location onboard NAS Meridian.

[8] In *United States v. Carter*, CAAF explained that a strict reading of the words "substantial basis" in Mil. R. Evid. 311(c)(3)(B) might render the good faith exception a nullity in light of *Illinois v. Gates*, 462 U.S. 213, 238 (1983), which uses the same words to describe a reviewing court's standard of review for a magistrate's probable cause determination. 54 M.J. 414, 421 (C.A.A.F. 2001). In an effort to bring the rule into line with the good faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984)—i.e., the Supreme Court case that gave rise to the good faith exception in the first place—CAAF held that this language in the exception ultimately places the focus on the objective reasonableness of law enforcement agent's belief, as opposed the authorizing official's, as to the existence of probable cause. *Carter*, 54 M.J. at 422.

to the commander or magistrate issuing the search and seizure authorization are 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *United States v. White*, 2020 CAAF LEXIS 618, at \*15 (C.A.A.F. 2020) (quoting *Carter*, 54 M.J. at 419). Here, based on our above discussion, we find that SA Sierra had an objectively reasonable belief that the information he provided in his affidavit gave the TRNGCMD Commander a substantial basis to find probable cause to issue the CASS.[9]

Third, the evidence supports that subsection (C) of Mil. R. Evid. 311(c)(3) is also met here. Interpreting this subsection, CAAF has found that the rule encapsulates the requirements of *United States v. Leon*, 468 U.S. 897 (1984) that "objective good faith cannot exist when the police know that the magistrate merely rubber stamped their request, or when the warrant is facially defective." *Carter*, 54 M.J. at 421. Here we find little evidence to suggest the CASS was merely rubber-stamped, sought or executed in bad faith, or that it was facially defective.[10] Given that the CASS was issued by a general officer and that a staff judge advocate was involved with the execution of the CASS application, which had its foundation in the agent's thorough affidavit, we find it to be objectively reasonable for law enforcement officers to have relied on this CASS in good faith.

Finally, even assuming *arguendo* the search was unlawful and the conditions of the good faith exception were not met, we conclude that exclusion of the evidence at issue here would not result in appreciable deterrence of future unlawful searches or seizures, nor would the benefits of such deterrence outweigh the costs to the justice system. Mil. R. Evid. 311(a)(3). In

---

[9] Nor do we find that SA Sierra's affidavit offered the TRNGCMD Commander the type of reckless falsity or "bare bones recital of conclusions" that no reasonable law enforcement official could execute in good faith and that CAAF has suggested would fail subsection (B) of the exception. *See Carter*, 54 M.J. at 421 (explaining that Mil. R. Evid. 315(c)(3)(B) captures the first and third prongs of the good faith exception outlined in *Leon*, mandating that search warrant affidavits "must not be intentionally or recklessly false," and must be more than 'bare bones' recitals of conclusions." 468 U.S. at 914-15).

[10] Appellant notes a scrivener's error in the CASS, that it was based solely on an affidavit, the fact that it was signed on the same day it was applied for, and alleges that it contained "no facts" demonstrating that evidence of crime would be found on the phone. In light of our foregoing discussion, we do not find these points—many of which are not uncommon in the pursuit of search authorizations by law enforcement—persuasive evidence that the TRNGCMD Commander merely "rubber-stamped" the CASS.

pursuing the CASS, the agent provided a detailed, seven-page affidavit describing a years-long murder investigation, from a death scene and autopsy yielding little basis to suspect foul play, through background interviews and digital forensic analysis, and eventually the re-interview of Appellant, who incriminated himself in his wife's death. The CASS, while broadly worded in its technical approach, was nevertheless tailored to the specific crimes the investigation had brought light, based on the involvement of cell-phone communications and cell-phone-based internet searches in connection with those crimes. Even though the evidence obtained during the search here ultimately did not bear on the offenses to which the CASS was directed, we find under these circumstances little deterrent value in excluding the evidence. Nor would the benefits of such deterrence outweigh the costs to the justice system, which both envisions and encourages law enforcement to pursue evidence in such a detailed, methodical fashion.

## B. Chain of Custody

In April 2018, while on pretrial restriction in connection with the investigation and subsequent charges against him, Appellant failed to attend a required muster. He was tracked down to the home of his girlfriend, where law enforcement found him lying on the floor with bloodshot eyes, a bloody nose, and a suicide note nearby. Appellant's girlfriend reported he had taken a bunch of pills earlier in the day and had been stopped from attempting to hang himself with a belt.[11] Appellant was taken to a U.S. Naval Hospital, where the treating physician ordered a medical urinalysis to evaluate him for drug overdose. The hospital's process for medical urinalyses was for a hospital corpsman or nurse to obtain a urine sample from the patient, have the container containing the sample labelled with the patient's identifying information, and then deliver it to the hospital's laboratory for testing. The hospital lab would test the sample, and the results would be made available to the treating physician. Any sample testing presumptively positive for a controlled substance by the hospital lab would be poured into a new bottle, re-labelled and sent to a civilian laboratory, LabCorp, for confirmatory testing. The hospital did not generate chain of custody documents or employ sealed, tamper-proof bottles in the course of this process.

---

[11] She later testified there was cocaine in the house during a previous timeframe, but she did not witness Appellant using it.

Prior to trial, the Defense moved to exclude the urinalysis evidence—i.e., the urine specimen bottle, the testimony of the LabCorp lab manager, and the LabCorp litigation report reflecting a positive result for cocaine—on grounds of a faulty chain of custody. Specifically, the Defense argued the Government could not demonstrate the urine sample tested by LabCorp was actually obtained from Appellant. After a hearing, the military judge reserved ruling on the motion, stating that the Government would be given an opportunity to lay adequate foundation for the evidence at trial.

At trial, the treating physician testified that she ordered Appellant's urinalysis, but had no involvement in the collection or testing of any urine sample identified to be Appellant's. She was then allowed to testify that the hospital lab results were presumptively positive for cocaine. She was further allowed, over Defense objection, to testify that she trusted the hospital lab's urinalysis results and found them reliable. The LabCorp lab manager testified about his lab's procedures for receiving and testing a urine sample, which included pouring the sample into a LabCorp bottle labelled for its internal use. He testified that based on his review of the LabCorp report, a sample identified to be Appellant's arrived in an unsealed, non-tamper-proof bottle with no chain of custody documentation, which did not meet the company's own guidelines for forensic testing. He was then allowed to testify that the results of the clinical tests conducted by LabCorp on the sample were positive for a metabolite of cocaine.

When the Defense renewed its foundational objection to the urine sample bottle and the LabCorp report, the military judge acknowledged the "complete and utter lack of chain of custody between the time [the treating physician] pressed the button on the computer in which she ordered the test and . . . the time that it got to LabCorp."[12] She nevertheless overruled the Defense objection, admitted both the LabCorp report (as a business record) and the urine sample bottle, and told the Defense it was "free to argue as to the gaps in the chain of custody."[13]

Appellant now asserts the military judge abused her discretion by admitting the urinalysis evidence without sufficient foundation linking it to Appellant. We review rulings to admit or exclude evidence for an abuse of discretion. *United States v. Solomon*, 72 M.J. 176, 179 (C.A.A.F. 2013). "The

---

[12] R. at 593-94.

[13] *Id.* at 591.

abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Lloyd*, 69 M.J. at 99 (citation and internal quotation marks omitted).

### 1. The requirement of authenticity

In order for real evidence to be admitted at trial, it must first be authenticated, which requires that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Mil. R. Evid. 901(a). "Generally fungible evidence [such as bodily fluids[14]] becomes admissible through a showing of continuous custody which preserves the evidence in an unaltered state." *United States v. Nault*, 4 M.J. 318, 319 (C.M.A. 1978). "Likewise, the results of tests performed on a fungible substance require a 'chain of custody on which to predicate admission of the laboratory analysis into evidence.'" *United States v. Maxwell*, 38 M.J. 148, 150 (C.M.A. 1993) (quoting *United States v. Courts*, 9 M.J. 285, 290 (C.M.A. 1980)). Such authentication typically requires a "stringent tracing" of the evidence. *Nault*, 4 M.J. at 320.

That said, "[t]he fact of a missing link does not prevent the admission of real evidence, so long as there is sufficient proof that the evidence is what it purports to be." *Maxwell*, 38 M.J. at 150 (quoting *United States v. Howard-Arias*, 679 F.2d 363, 366 (4th Cir.), *cert. denied*, 459 U.S. 874 (1982)). "Where the chain of custody is incomplete, other evidence may be sufficient to bridge the gap." *Id.* (citation and internal quotation marks omitted). Nevertheless, while such evidence may be direct or circumstantial, in one way or the other "[t]he Government must show that there is a reasonable probability the sample which was tested was in fact from the purported source *and* that it was not altered." *Id.* (emphasis in original).

Here, the military judge initially deferred ruling on the Defense's pretrial motion to exclude the urinalysis evidence subject to other evidence "connecting it up" to Appellant at trial. The evidentiary rules allow for such conditional admission of evidence and make the determination of whether the condition has been fulfilled the "sole responsibility" of the trial judge. Mil. R. Evid. 104(b). In this case, however, when the Defense renewed its objection based on the evidence adduced at trial, the military judge overruled the

---

[14] *See United States v. Maxwell*, 38 M.J. 148, 150 n.2 (C.M.A. 1993) (samples of bodily fluids are fungible evidence) (citation omitted).

objection without articulating how she believed the urinalysis evidence had been sufficiently connected to Appellant. Instead, she acknowledged the "complete and utter lack of chain of custody between the time [the treating physician] pressed the button on the computer in which she ordered the test and . . . the time that it got to LabCorp."[15]

We have previously discussed the dividing line between a mere gap in the chain of custody and the utter failure to provide sufficient proof that the evidence is what it purports to be. *See United States v. Hinojos*, No. 201300305, 2015 CCA LEXIS 20 (N-M. Ct. Crim. App. Jan. 27, 2015) (unpublished). In *Hinojos*, the government's expert testified that DNA found on the victim's underwear was a match for the DNA on a buccal swab purportedly collected from the appellant. The expert was allowed to do so over defense objection even though the government laid no foundation before, during, or after the expert's testimony to establish that the DNA on the buccal swab had actually been collected from the appellant. We found that the government failed to provide sufficient foundation for the swab—and thus the expert testimony conditioned on the authenticity of the swab—and consequently held the admission of the testimony was an abuse of discretion. *Id.* at *9-10.

We reach a similar conclusion here, and find this case distinguishable from *United States v. Maxwell*, cited by the Government, wherein our superior court upheld the trial judge's admission of a blood alcohol content [BAC] test despite no direct testimony that the sample tested was collected from the appellant. In *Maxwell*, as here, the medical personnel involved in the appellant's treatment could testify only about the hospital's standard operating procedures for BAC testing, not the actual collection of the sample. However, the procedures in *Maxwell* involved placing the sample in a labelled, vacuum-sealed test tube such that nothing could be "added without blowing the top off the tube." *Maxwell*, 38 M.J. at 151. Furthermore, the hospital lab technician testified about the tests he himself conducted and the results he obtained from the actual sample, which was initially labelled "John Doe" upon the appellant's unidentified arrival after a car accident but was later confirmed to be the appellant's. Thus, unlike in this case, the evidence in *Maxwell* demonstrated "a reasonable probability the sample which was tested was in fact from the purported source *and* that it was not altered." *Id.* at 150 (emphasis in original).

---

[15] R. at 593-94.

Here, by contrast, a urine sample arrived at a civilian lab in an unsealed bottle without sufficient chain-of-custody documentation to meet even the lab's own internal guidelines for forensic testing. The eventual trial testimony provided little more foundation than, in the military judge's words, it was "a red bottle with some stickers on it that [the LabCorp lab manager] recognize[d] as one that was tested in LabCorp."[16] And unlike in *Maxwell*, the foundational testimony came from witnesses uninvolved with either the collection of the sample or its chain of custody, or its testing. Absent a more developed record from which to assess the military judge's rationale for finding a sufficient connection between the urine sample analyzed by LabCorp and Appellant, we find the admission of both the bottle and the lab results was clearly unreasonable under the circumstances, and therefore an abuse of discretion.[17]

### 2. Prejudice

Having found error, we test for prejudice. "Whether an error, constitutional or otherwise, was harmless is a question of law that we review de novo." *United States v. McCollum*, 58 M.J. 323, 342 (C.A.A.F. 2003) (citation omitted). For a non-constitutional error to be harmless, we must find "the error did not have a substantial influence on the findings." *Id*. We make this assessment by comparatively weighing "(1) the strength of the Government's

---

[16] R. at 594.

[17] We cannot overemphasize that in order to obtain maximum deference at the appellate level, trial judges must ensure that the rationale for their decisions, whether written or oral, is adequately memorialized on the record. As one commentator has aptly explained:

> The abuse of discretion standard can significantly protect a military judge's rulings from reversal. To receive the full benefit of this standard, though, a military judge must convince the appellate court that he or she thoroughly, logically, and fairly considered the matter at issue. When the military judge does so by developing the record, issuing supported findings of fact, correctly citing the relevant legal authorities, and reaching a conclusion that falls within a range of reasonable decisions, the abuse of discretion standard will generally favor upholding the military judge's ruling. Where the military judge fails to take these steps, the appellate court will view the military judge's ruling with more scrutiny.

Colonel Jeremy S. Weber, *The Abuse of Discretion Standard in Military Justice Appeals*, 223 Mil. L. Rev. 41, 93-94 (2015).

case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *United States v. Berry,* 61 M.J. 91, 98 (C.A.A.F. 2005).

Here, the urinalysis evidence at issue was the principal basis underlying Appellant's conviction of cocaine use under Specification 2 of Charge VI. The Government's case absent this clearly material and highly persuasive evidence was weak by comparison. We find that the erroneous admission of the evidence had a substantial influence on the findings and was therefore not harmless. Accordingly, we conclude we must set aside the finding of guilty for Specification 2 of Charge VI, which we accomplish in our decretal paragraph below.[18]

## C. Factual Sufficiency

Appellant asserts the evidence is factually insufficient to support his convictions for failure to obey a lawful order and willful discharge of a firearm under such circumstances as to endanger human life. We review issues of factual sufficiency de novo. UCMJ, art. 66(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). In evaluating factual sufficiency, we determine whether, after weighing the evidence in the record of trial and making allowances for not having observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a "[r]easonable doubt, however, does not mean the evidence must be free from conflict." *United States v. Rankin,* 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006).

### 1. Failure to obey lawful order

In Specification 1 of Charge I, Appellant was convicted of failure to obey a lawful order by mustering in civilian clothes while on pretrial restriction in violation of his restriction orders requiring him to be in uniform. In order to prove this offense, the Government was required to prove beyond a reasona-

---

[18] This conclusion moots Appellant's fifth AOE, asserting the evidence is factually insufficient to support his conviction of this specification.

ble doubt that (1) a member of the armed forces issued a certain lawful order; (2) Appellant had knowledge of the order; (3) Appellant had a duty to obey the order; and (4) Appellant failed to obey the order. *Manual for Courts-Martial, United States* (2016 ed.) [*MCM*] , pt. IV, ¶ 16.b.(2).

Appellant asserts the proof was lacking for the second element, that he had actual knowledge of the order requiring him to be in uniform while mustering. "While knowledge of the order may be proved by circumstantial evidence, the knowledge required must be actual and not constructive." *United States v. Pettigrew*, 41 C.M.R. 191, 195 (C.M.A. 1970); *MCM*, pt. IV, ¶ 16.c.(2).(b). "Knowledge is 'actual' when it is conveyed directly to the accused." *United States v. Keith*, 13 C.M.R. 135, 138 (C.M.A. 1953).

On 27 December 2017, Appellant was issued a two-page set of restriction orders by his commanding officer that required him to muster at certain times during the week and on weekends, placed other restrictions on his liberty, and mandated that the "[u]niform of the day will be worn at all times except for sleeping or when directed otherwise."[19] Appellant's first sergeant briefed him about his being placed on pretrial restriction, but did not specifically go over with Appellant the terms of the orders he received. However, Appellant signed a receiving endorsement on page two of the orders acknowledging that he understood and would comply with them.

Appellant began mustering for restriction on 17 January 2018 after the holiday period. His musters were recorded on a two-page check-in sheet that reflects his musters from that day forward, including his Saturday/Sunday musters over two successive weekends. Beginning on page two of the check-in sheet, the muster times listed are inconsistent with the restriction orders. This discrepancy was apparently not noticed until the third Saturday of Appellant's restriction period, 3 February 2018, when Appellant mustered wearing civilian clothes and the command duty officer [CDO] asked Appellant why he was not on time and in uniform. When Appellant expressed confusion, a discussion ensued with Appellant's first sergeant about the inconsistencies between the muster times on the check-in sheet versus the restriction orders. Thereafter, the muster times on the check-in sheet were modified to be consistent with the restriction orders. The CDO clarified these times with Appellant and reiterated the requirement that he be in uniform.

---

[19] Pros. Ex. 6 at 1.

Appellant argues that because he appeared (justifiably) confused about the check-in time, there is reasonable doubt as to whether he was also confused about the uniform requirement. That claim is not supported by the evidence before us. The reason for the confusion regarding the check-in time was due to a specific inconsistency in the paperwork he was given. There was no lack of clarity in the restriction orders as to the uniform requirement, nor evidence Appellant himself was unclear about that requirement. While the evidence does not reflect that anyone went over each term of the restriction orders with Appellant, his signature appears on page two of the orders indicating that he understood and would comply with them. We find this evidence proof beyond a reasonable doubt that the orders were directly conveyed to Appellant, such that he had actual knowledge of them. We therefore find the evidence factually sufficient to support his conviction.

*2. Wrongful discharge of a firearm*

For Specification 4 of Charge II, Appellant was convicted of willfully discharging a firearm under such circumstances as to endanger human life, in violation of Article 134, UCMJ. In order to prove this offense, the Government was required to prove beyond a reasonable doubt that (1) the accused discharged a firearm; (2) the discharge was willful and wrongful; (3) the discharge was under such circumstances as to endanger human life; and (4) under the circumstances, the conduct of the accused was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the armed forces. *MCM*, pt. IV, ¶ 81.b.

Appellant asserts the proof is lacking on the third element, that Appellant's actions were "under such circumstances as to endanger human life." We agree. As the military judge correctly instructed, this element requires "a reasonable possibility of harm to human beings. Proof that human life was actually endangered is not required."[20] However, the evidence must demonstrate at least "a reasonable potentiality for harm to human beings in general." *United States v. Potter*, 35 C.M.R. 243, 245 (C.M.A. 1965); *MCM*, pt. IV, ¶ 81.c.

Appellant fired a pistol three times toward the sky out of the driver's side window while he was driving at night on a backroad on the outskirts of a town in rural Mississippi. The backroad he was traveling on ran parallel to a highway approximately 500 yards away on the other side of some woods.

---

[20] R. at 956-57.

There were some houses off the road to the passenger's side, but no apartment complexes, bicyclists, or pedestrians nearby. Based on the headlights reflected in the rearview mirror in the video, another car appears to have been traveling in the same direction as Appellant at some distance behind him. At the time, Appellant's girlfriend, Ms. Foster, was sitting next to him in the passenger seat videotaping as he fired the pistol into the air. Ms. Foster did not post the video on social media or disseminate it broadly, but sent Appellant a copy of it at his request. She testified she did not feel endangered by his actions, nor, based on their surroundings, did she feel they put anyone else in danger.

We do not find this evidence sufficient to prove beyond a reasonable doubt that Appellant's conduct caused a reasonable potentiality for harm to human beings. As our sister court found in another case of an appellant firing a handgun toward the sky (in that case, in a residential area), "the idea that a bullet shot into the air presents a safety threat to human life is not so self-evident that the Government did not need to introduce any evidence on this point." *United States v. Burns*, No. ACM S32084, 2013 CCA LEXIS 1050, *9 (A. F. Ct. Crim. App. Dec. 18, 2013) (unpublished), *aff'd*, 73 M.J. 407 (C.A.A.F. 2014). Absent further evidence in this regard, we find persuasive the discussion and holding in *Burns*[21] that the evidence presented in this case supports only a conviction for the lesser-included offense of negligent discharge of a firearm, in violation of Article 134, UCMJ, which requires the Government to prove that (1) the accused discharged a firearm; (2) the discharge was caused by the negligence of the accused; and (3) under the circumstances, the conduct of the accused was of a nature to bring discredit upon the armed forces. *MCM*, ¶ 80.b. Specifically, with respect to the second element, although Appellant intentionally fired the weapon, we find that his actions were nevertheless negligent in that they "exhibit[ed] a lack of that degree of care of the safety of others which a reasonably careful person would have exercised under the same or similar circumstances." *MCM*, pt. IV, ¶ 85.c.(2). Given the surrounding circumstances in this case, including the fact that a car was following Appellant's when he discharged the firearm, we

---

[21] The court in *Burns* found that after reviewing over 60 cases involving convictions for similar offenses under the UCMJ, "[n]early every case contained facts far more egregious than the appellant's behavior, involving either horizontal shooting toward occupied areas or indiscriminate shooting indoors." *United States v. Burns*, No. ACM S32084, 2013 CCA LEXIS 1050, *9, *13 (A.F. Ct. Crim. App. Dec. 18, 2013) (unpublished), *aff'd*, 73 M.J. 407 (C.A.A.F. 2014).

find the evidence supports beyond a reasonable doubt that his conduct was both negligent and service-discrediting. We therefore set aside his conviction for the greater offense and affirm a conviction for this lesser-included offense.

**D. Sentence Reassessment**

Having set aside some of Appellant's convictions, we must determine whether we can reassess the sentence at the appellate level or whether we must remand for the trial court to do so. We do so by determining: (1) whether there have been dramatic changes in the penalty landscape or exposure; (2) whether sentencing was by members or a military judge alone; (3) whether the nature of the remaining offenses captures the gravamen of the criminal conduct included within the original offenses and whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses; and (4) whether the remaining offenses are of the type with which appellate judges should have the experience and familiarity to reliably determine what sentence would have been imposed at trial. *United States v. Winckelmann*, 73 M.J. 11, 15-16 (C.A.A.F. 2013).

Here, we determine that we can reassess the sentence. As the maximum sentence remains capped by the jurisdictional maximum of a special court-martial, there has been no dramatic change in the penalty landscape or exposure. While Appellant was sentenced by members, the nature of the remaining offenses captures the gravamen of his criminal conduct and does not significantly alter the circumstances of the offenses relevant to sentencing. Finally, the remaining offenses are of the type with which appellate judges have experience to reliably determine what sentence would have been imposed at trial. Under these circumstances, we are confident that the sentence the members would have imposed for the remaining offenses would be the same as the one they originally adjudicated.

## III. CONCLUSION

Accordingly, Appellant's convictions for Specification 2 of Charge VI and the greater offense of willful discharge of a firearm under such circumstances as to endanger human life under Specification 4 of Charge II are **SET ASIDE**. His conviction of the lesser-included offense of negligent discharge of a firearm under Specification 4 of Charge II, along with the remaining findings and the sentence, are **AFFIRMED**.

Judges STEWART and HOUTZ concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court